[No. 44579.   En Banc.   April 6, 1978.]

KING COUNTY WATER DISTRICT NO. 75, *Respondent,* v. THE CITY OF SEATTLE, ET AL, *Appellants.*

*John P. Harris, Corporation Counsel,* and *Arthur T. Lane, Assistant,* for appellants.

*Cartano, Botzer & Chapman,* by *Frank W. Birkholz* and *John D. Cartano,* for respondent.

*Christopher T. Bayley, Prosecuting Attorney,* and *Diane E. Dray* and *Thomas A. Goeltz, Deputies,* on behalf of King County, amici curiae.

DOLLIVER, J.—Defendant Seattle Water Department (Department) supplies water to two classes of customers,

both inside and outside the city limits, (1) retail customers to whom water is delivered directly, and (2) wholesale customers (purveyors) who purchase water for resale to their own customers. Plaintiff King County Water District No. 75 (District) is a wholesale customer.

The District brought this action challenging several elements of the rate structure which establishes the purchase price between purveyors and the Department: (1) The District's water storage capabilities substantially benefit the city and must be given consideration in the rate structure; (2) the Department used an excessive interest rate in computing expenses attributable to purveyors; (3) the City of Seattle's business and occupation tax imposed on the Department is wrongfully allocated to purveyors outside the city limits; and (4) the Department wrongfully allocated a major share of the construction costs of the Tolt River facility to purveyors.

The trial court found for the District on the first element and for the Department on the latter three. In awarding relief for the District's storage capabilities, the trial judge denied restitution for amounts previously paid to Seattle, and limited the effect of the judgment to prospective periods. The District challenged the limited relief granted. The City of Seattle and the Seattle Water Department appeal that portion of the judgment awarding relief to the District for its storage capabilities. The District cross–appeals the remaining issues. We reverse on issues 1 and 3 and affirm on 2 and 4. We concur with the prospective application of the judgment.

The Department's rate structure distinguishes between the two classes of customers and attempts to apportion costs. In 1969 and again in 1974, the Department employed independent consulting firms to undertake comprehensive cost of service studies for the entire system so as to allocate equitably the respective expenses attributable to purveyors and retailers. The first study was performed by the firm of Cornell, Howland, Hayes, Merryfield and Hill (Cornell),

and the latter by R. W. Beck and Associates (Beck). Subsequent to receipt of each report, ordinances were enacted by the Seattle City Council increasing the rates of both classes of customers.

During the 1960's, the District, located totally outside Seattle, became a customer of the Department, and during the years 1968 through 1970 added 8 million gallons of storage capacity to its existing facilities at a cost of approximately $3,500,000, including interest and financing. The District claims this storage allows the Department to serve them with mains which are smaller and more economical than those necessary to serve other purveyors who, due to inadequate storage, require larger mains to meet peak day requirements.

## I.

Did the lower court err in requiring the Department to give recognition to the District's storage capacities when establishing water rates for the District?

The trial court held the storage capabilities of the District to be of substantial benefit to the Department. Based on this finding, the trial judge concluded that to classify the District with purveyors who do not have sufficient storage capacities constitutes adverse discrimination and amounts to unjust and unreasonable rate making.

Defendant argues such classification is reasonable. It contends its duty to each purveyor is identical—it must provide adequate facilities to meet each purveyor's peak day requirements. The Department asserts it serves the District with two 24–inch mains which are capable of delivering to the District a flow of 32 cubic feet per second (CFS) which equals the peak day requirements. It is undisputed two 24–inch mains will conduct water flow at the rate of 32 CFS. The Department further maintains the extra storage capacity is not required in order to meet the peak day requirements of the District.

One of the exhibits submitted to this court is the original Cornell report which includes a schematic diagram of the

Department's water system. According to this sketch, there are two 24-inch mains which serve the District exclusively. One of these mains runs along Des Moines Way South and the other connects at the Crestview pumping station. The Department alleged at trial these mains have been serving the District since 1964.

The trial court's finding in regard to the two mains is ambiguous. However, no evidence contravening the existence of the two mains appears in the record. Plaintiff's brief recognizes the existence of both the Crestview and the Des Moines Way mains.

The District argues the two mains were "designed to serve not only Water District 75 but others." However, no evidence in support of this proposition was submitted to the trial court. The only evidence in the record regarding the mains is the Cornell map which indicates the mains serve the District *exclusively.* At trial, Mr. Philip M. Botch, witness for the District, stated, "the Des Moines Way pipeline which, I might say, serves Water District 75—in fact, I don't think that you have another customer on that line" indicating the District's knowledge that at least one of the mains serves it exclusively.

While the Department is required to meet the peak day requirements of its purveyors—here 32 CFS—each purveyor is required to provide enough storage to meet hourly fluctuations during the peak day. In the case of the District, the peak *hourly* demand is approximately 2 1/2 times the peak day requirement of 32 CFS.

At the time of trial, nearly 80 percent of the water supplied to other districts was to districts which have substantial storage capacity. Defendant Department has acted in a reasonable exercise of its legislative authority to correct any inequities which may exist in regard to purveyor storage capabilities and to encourage the construction by purveyors of adequate storage facilities to meet peak hourly demand. On September 9, 1975, the Seattle City Council adopted ordinance No. 104922 which provides, in pertinent part:

[T]he Superintendent shall implement on July 1, 1977 a demand charge based on such water districts', municipalities' or associations' effective deficient water storage, as determined by the peak instantaneous flow rate, and the equivalent financing costs to provide storage. The proceeds from this demand charge shalh be deposited in a separate fund for use in financing projects which serve the wholesale areas.

We conclude the Department fulfilled its duty to the District by installation of the two mains in 1964 which meet the peak day requirements of the District. The Department need not consider incidental benefits which inured to it when the District subsequently installed storage capabilities which reduced peak demands on the Department's water system. The rate charged the District is not unreasonable. *See Port Orchard v. Kitsap County,* 19 Wn.2d 59, 141 P.2d 150 (1943); *Geneva Water Corp. v. Bellingham,* 12 Wn. App. 856, 532 P.2d 1156 (1975).

## II.

The District next contends the trial court erred in upholding the Department's inclusion of a 7 percent rate of return in water rate computations. The District contends the Department is limited to collection of the interest rate which is established as the historical cost of its capital. The District maintains the Department cannot charge in excess of 3.33 percent of the total plant investment as this represents its historical cost of capital.

In support of this contention, the District refers to numerous cases involving calculation of the cost of capital to a public utility wherein it was held the public utility was restricted to actual rather than replacement costs when establishing capital costs. The District has misinterpreted the Department's rate structure.

The Department establishes its water rates in accordance with the utility basis accounting method. This method requires determination of a rate base which is the value of the property on which the utility is entitled to earn a

return. After the rate base is established, it is also necessary to fix a fair rate of return on the rate base.

One of the elements in establishing the rate base is the cost of capital. *See Sun City Water Co. v. Arizona Corp. Comm'n,* 26 Ariz. App. 304, 547 P.2d 1104 (1976). The cost of capital includes interest payments on debt and equity capital. *Sun City Water Co. v. Arizona Corp. Comm'n, supra.* However, the Department is not asserting its cost of capital is 7 percent. Instead, it claims it is entitled to a fair rate of return on its overall investment. Authority cited by the District does not address the issue of whether the Department is entitled to a return on its investment. Instead, the District addresses the issue of what interest rate is allowable in determining the cost of capital for purposes of arriving at the rate base.

■ Whether a public utility is entitled to a rate of return on its investment was discussed in *Bluefield Water Works & Imp. Co. v. Public Serv. Comm'n,* 262 U.S. 679, 692–93, 67 L. Ed. 1176, 43 S. Ct. 675 (1923). The court held:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

We find no reason for distinguishing between public utilities and municipal utilities in regard to the issue of rate of

return and conclude the Department may charge a reasonable rate of return for its investment. The remaining question is whether 7 percent is a reasonable rate.

The District has brought forth no evidence to support a finding that 7 percent is not a reasonable rate of return for the Department. Conversely, the Department has submitted to this court the Beck report which indicates the reasonableness of a 7 percent return on the Department's investment. We conclude the rate of return is not unreasonable and affirm that portion of the trial court's holding.

### III.

Plaintiff District challenges the inclusion of the City of Seattle's business and occupation tax in water rate computations. The trial court entered finding of fact No. 14, which states, in pertinent part:

> That the City of Seattle has levied a 7 per cent Business and Occupation Tax on the gross revenue of the Seattle Water Department and is planning to increase this to 8 per cent in the near future. This money is paid by the Water Department into the General Fund of the City of Seattle. That the tax is enacted by the Seattle City Council and approved by the Mayor of Seattle.

An allowance for this 7 percent tax is made when the Department establishes expenses attributable to water purveyors. Plaintiff contends imposition of the business and occupation tax on sales of water to districts outside the Seattle city limits is impermissible under prior decisions of this court. Three cases previously decided by this court involved related issues.

In *State ex rel. Pacific Tel. & Tel. Co. v. Department of Pub. Serv.*, 19 Wn.2d 200, 142 P.2d 498 (1943), we considered whether Pacific Telephone could include as a general operating expense the business and occupation tax imposed by seven different cities within the state, including Seattle. The Department of Public Service (now the Washington Utilities and Transportation Commission) argued that a business and occupation tax levied by a city against Pacific Telephone by way of a percentage on the company's gross

income from that city, if included in the general operating expense and reflected in statewide rates, constitutes unjust discrimination as a matter of law against ratepayers using telephones in portions of the state where no such tax has been imposed.

Ruling on this contention, we held moneys paid by Pacific Telephone to the cities under a taxing ordinance were proper expenses of the company but must be segregated and passed on to the ratepayers in the respective municipal corporations to which the moneys were paid. In so holding, we stated:

> Manifestly there is an element of unjust discrimination in allowing one community to levy and collect from respondent or any public utility engaged in business throughout the state an occupation tax which in turn the utility would collect by a statewide increase in rates. . . .
>
> . . .
>
> We are convinced that the department, in so far as such taxes are concerned, has the power to fix special exchange rates applicable to the different communities, which will in effect require the rate payers in each community to absorb a sum equal to the amount of the tax which respondent is required to pay to that municipality.

*State ex rel. Pacific Tel. & Tel. Co. v. Department of Pub. Serv., supra* at 277.

Plaintiff District also refers us to the case of *Lone Star Cement Corp. v. Seattle,* 71 Wn.2d 564, 429 P.2d 909 (1967). That case involved construction of sections 3 and 6 of Seattle ordinance No. 72630, which sections have subsequently been amended but remain substantially the same and are now codified as Seattle Code § 11.08.040 and .070. Section 11.08.040 imposes the tax as follows:

> There is levied upon . . . every person on account and for the privilege of engaging in business activities, a license fee or occupation tax . . .
>
> (a) Upon every person engaging within this city in business as an extractor; as to such persons the amount of the tax with respect to such business shall be equal to the value of the products extracted for sale or commercial use, multiplied by the rate of one–tenth of one percent.

The measure of the tax is the value of the products so extracted, *regardless of the place of sale or the fact that deliveries may be made to points outside the city;*

(Italics ours.)

Section 11.08.070 allows apportionment of tax for persons maintaining facilities partly within and partly outside of the city in the following manner:

Persons maintaining an office, plant, warehouse or other business establishment which is partly within and partly outside of the city, *shall be taxable on the value of products, gross proceeds of sales, or gross income of the business attributable to business within the city,* ascertained either (i) by a segregation of business within and business outside the city, shown and supported by separate accounting record . . .

(Italics ours.)

*Lone Star* involved a cement manufacturer which had two plants, one located in Seattle and one in Concrete, Washington. Because the Seattle plant housed records for both plants, the entire gross income of Lone Star was subjected to the business and occupation tax by Seattle. Lone Star paid the entire tax but protested payment on income attributable to sales of products manufactured at Concrete for delivery to points outside Seattle. Lone Star argued its income attributed to those products was exempt under section 6 of Seattle ordinance No. 72630 (now 11.08.070). In holding for Lone Star, we stated at page 572:

The phrase, "the privilege of doing business," used in section 3 of Seattle's ordinance, is all–inclusive; but taxation of that privilege must be confined to a standard within the territorial limits of Seattle, for the city has no power either to authorize, license, or tax activities beyond its territorial limits.

Subsequent to *Lone Star,* we decided *Dravo Corp. v. Tacoma,* 80 Wn.2d 590, 496 P.2d 504 (1972), where two out–of–state corporations contracted with the City of Tacoma to construct the Mossyrock Dam. Tacoma notified bidders at the initial stages that local business and occupation taxes would apply to the contract and Dravo bid

accordingly, making an allowance for the tax. Through the course of the construction contract, Tacoma collected the tax from Dravo who paid under protest. Dravo then instituted a suit for refund to recover amounts paid Tacoma due to the tax assessment. We held imposition of the tax did not offend the due process or commerce clause provisions of the United States Constitution.

Our conclusion in *Dravo* was based on our finding that execution of the contract in Tacoma was a taxable event for purposes of the business and occupation tax ordinance involved. That ordinance, Tacoma Code § 6.68.225, provides, in pertinent part:

> [T]here is hereby *levied upon . . .* every person *. . . a tax on the act or privilege of engaging in business activities and transactions with the city involving* the purchase of materials, supplies, equipment, *improvements, and other contractual services.* Such tax shall be *levied on the privilege of accepting and executing the contract* . . .

(Underscoring ours.) *Dravo Corp. v. Tacoma, supra* at 593–94.

In *Dravo,* we found representatives of Dravo had delivered the bid to officials of Tacoma at their offices within the city limits. We further found city officials executed the documents in Tacoma after they had received signed copies mailed them from Dravo. These facts were sufficient for us to conclude for taxation purposes that the place of making of the contract was in Tacoma. Because we interpreted the Tacoma business and occupation tax ordinance to contemplate *entering into* a contract as the taxable event, we held the Tacoma tax valid.

None of the above cited cases deals with the statute challenged by plaintiff. Seattle's tax is codified in Seattle Code § 11.12.050 which provides, in pertinent part:

> There are hereby levied upon, and shall be collected from everyone including the city of Seattle on account of certain business activities engaged in or carried on, annual license fees or occupation taxes in the amounts to

be determined by the application of rates given against gross income as follow:

. . .

(d) Upon everyone, including the city of Seattle, engaged in or carrying on the business of selling or furnishing water for hire, a fee or tax equal to seven percent of the total gross income from such business in the city; provided, that the minimum fee or tax shall not be less than one thousand dollars per tax year.

Provided that as to the city of Seattle in the conduct of its municipal water utility, such tax shall be applicable to the business of such utility done without, as well as within, the city; and there shall be levied upon and collected therefrom, in addition, an occupation surtax in the gross amount of five hundred forty thousand dollars per year, and without tax thereon, payable in monthly installments or otherwise as determined by the superintendent of water;

■ We are not asked by the parties to decide whether Seattle can impose on the Department a tax upon revenue generated by sales to customers residing outside the city limits. What we must determine is whether the Department can pass this tax to customers outside the city by way of the water rates imposed on those nonresident customers.

The Washington Utilities and Transportation Commission has dealt with this problem in the rate–making area and held utilities should not pass on local business and occupation taxes to ratepayers residing outside the jurisdiction imposing the tax. *See Washington Pub. Serv. Comm'n v. Pacific Power & Light Co.,* 33 P.U.R.3d 433 (1960); *Washington Pub. Serv. Comm'n v. Washington Water Power Co.,* 33 P.U.R.3d 468 (1960).

Cases arising in jurisdictions outside Washington have similarly limited collection of local business and occupation taxes to ratepayers residing within the territorial limits of the jurisdiction imposing the tax. In *Re Laclede Gas Co.,* 42 P.U.R.3d 209, 227 (Mo. Pub. Serv. Comm'n 1962), the Missouri Public Service Commission, while reviewing a gas company's proposed tariff increase, set forth the reasons for this rule:

The matter of eliminating gross receipts taxes from operating expenses has been before the commission many times since the report and order of the commission was issued in Case No. 12,976, Re Western Light & Teleph. Co. (1955) 6 Mo PSC NS 251, 10 PUR 3d 70. In that case the commission stated (10 PUR 3d at p. 79):

"A license tax is assessed wholly as a revenue–producing measure for a particular city or town making the assessment and the company's system–wide operations are not benefited by the payment of such tax. For that reason it should not be included as an operating expense to be borne by parties receiving no benefit from it. . . .

"The commission is of the opinion that it will avoid undue discrimination if only subscribers who reside in a city which levies a license tax are required to pay such tax."

On review the supreme court of Missouri, in affirming the opinion of the commission, stated (23 PUR 3d 164, 174, 310 SW2d 925, 934):

"The utility remains the party taxed and the utility still pays the tax—the only effect of the commission's order in that respect is to permit the utility to collect the money with which to pay the tax from the tax beneficiaries rather than from all subscribers. It must be apparent that a utility's subscribers will always provide the money for payment of all taxes—the utility has no other source of revenue—the only question is which subscribers should pay which tax. Under the commission's order, Western receives no more money and no higher rate of return than it would receive under its prior practice of collecting occupation taxes system–wide."

Similar rulings have been set forth by the Utah, Illinois and Virginia Supreme Courts in the cases of *Ogden City v. Public Serv. Comm'n,* 123 Utah 437, 260 P.2d 751 (1953); *Maywood v. Illinois Commerce Comm'n,* 23 Ill. 2d 447, 178 N.E.2d 345 (1961); *Newport News v. Chesapeake & Potomac Tel. Co.,* 198 Va. 645, 96 S.E.2d 145 (1957). The same rule has been upheld by public service commissions in 11 states. 6 P.U.R. Digest 2d, *Rates* § 147 (1963). Our research has discovered no reported decisions in which the opposite result was reached.

In a case strikingly similar to this case, the Colorado Public Utilities Commission in *Re Cortez Nat. Gas Co.,* 14 P.U.R.3d 105 (Colo. Pub. Util. Comm'n 1956), held a gas distributing company could not collect the local franchise tax from customers residing in areas surrounding the city of Cortez, notwithstanding a Cortez ordinance provided for tax based on the gross revenue of the gas company regardless of whether the income was generated from within or without the city.

We reverse the trial court's holding that the Department could pass on the Seattle business and occupation tax to purveyors whose districts are outside the city limits. Collection of such taxes must be exacted from the beneficiaries thereof, that is, the citizenry of the City of Seattle. However, the scope of our relief is prospective only, and no refund for amounts paid is granted.

## IV.

Plaintiff next contends the Department erroneously allocated 60 percent of the construction costs of the Tolt facilities to purveyors. The District argues its portion of the Tolt costs must be measured in regard to the overall purveyor usage of the total Seattle water supply and since purveyors use only 35 percent of the total Seattle water supply they should be assessed only 35 percent of the Tolt production costs.

In support of this proposition, the District refers us to *Re Trunkline Gas Co.,* 29 P.U.R.3d 1 (Fed. Power Comm'n 1959), where a gas company had obtained a new group of customers for which it was necessary to add new supply facilities and purchase natural gas at higher than existing rates. The company proposed to allocate the entire cost of the new facilities and the more expensive gas to the new customer block. The Federal Power Commission disallowed the proposed allocation of costs when it was shown the new facilities substantially benefited existing customers of Trunkline. It held it would be inequitable to assess all the

costs to the new customer block when benefits were received system wide. We agree.

Here, however, the Department has not proposed to allocate the entire costs of the Tolt facilities to purveyors. Instead, a percentage of 60 percent, which is commensurate with the purveyors' use of the Tolt facilities, has been allocated to the purveyors.

Testimony adduced at trial indicates the water consumption of the City of Seattle has not increased since prior to construction of the Tolt facilities. Defendant Department asserts it was increased demand from purveyor districts which necessitated construction of the Tolt facilities. Testimony also established 40 percent of the water extracted from the Tolt River is delivered to in–city customers while 60 percent goes to purveyors. The trial court held the city's allocation of costs to be reasonable.

As we stated in *Faxe v. Grandview,* 48 Wn.2d 342, 352, 294 P.2d 402 (1956):

> Rates established by a municipality for utility service to inhabitants are presumptively reasonable. It follows that one who challenges such rates as unreasonable has the burden of proof.

(Citations omitted.)

We hold the District has not met its burden of proof in regard to allocation of the costs of constructing the Tolt facilities. Regard was given in allocation to Seattle's use of that source and we are not convinced by the District that Seattle acted unreasonably.

Plaintiff's final contention is that the trial court erred in limiting the District to prospective relief only. The District has cited no authority for the proposition that the trial court must grant restitution for this situation. The type and extent of relief herein involved is a matter of discretion for the trial court and we affirm its judgment regarding the prospective nature.

King County, appearing amicus curiae, argues RCW 35.92 is constitutionally infirm in that it deprives nonresidents of Seattle of their right to participate in regional

water rate and supply decisions, and also operates to disenfranchise the same persons. This contention was not raised at trial and exceptional circumstances warranting its review do not exist. Accordingly, it is dismissed.

In summary, we reverse the trial court on Issue 1 regarding special recognition of the District's storage capacity; we affirm the Department's inclusion of the 7 percent rate of return on Issue 2; we reverse Issue 3 and hold that the business and occupation tax cannot be passed on to purveyors whose districts are outside the city limits, but that this relief is prospective only; and we affirm Issue 4, the determination of the trial court that the allocation of construction costs of the Tolt River facility was reasonable.

It is so ordered.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

Petitions for rehearing denied May 30, 1978.