[No. 22411-2-III.  Division Three.  July 1, 2004.]

ELAINE WILLMAN, ET AL., *Appellants*, v. THE WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, ET AL., *Respondents*.

*Eric E. Richter* (of *Henke & Richter*), for appellants.

*John L. West, Louis D. Peterson,* and *Mary E. Crego* (of *Hillis Clark Martin & Peterson, P.S.*); *Michael P. O'Connell, Jill D. Bowman,* and *James M. Van Nostrand* (of *Stoel, Rives, L.L.P.*) (*Scott J. Kaplan,* of counsel); and *Christine O. Gregoire, Attorney General,* and *Robert D. Cedarbaum, Senior Counsel,* for respondents.

KATO, C.J. — This appeal involves an ordinance adopted by the Yakama Nation Tribal Council imposing what it calls a franchise fee from utilities operating within the boundaries of the Nation's reservation. The Washington Utilities and Transportation Commission (WUTC) allowed PacifiCorp (which operates as Pacific Power and Light Company) and Cascade Natural Gas Corporation to pass on the cost of the fee to all customers within the reservation. Elaine Willman and Citizens Standup! Committee (hereafter petitioners) contend the fee is presumptively invalid and discriminatory against nonmembers. They also contend the WUTC erroneously concluded the fee should be recovered only from customers within the reservation

rather than from the utilities' customers statewide. We affirm and deny the petitioners' request for attorney fees.

The federal government created the Yakima Indian Reservation by treaty in 1855. The reservation encompasses approximately 1.3 million acres of land, mostly in Yakima County. *See Brendale v. Confederated Tribes & Bands of Yakima Indian Nation,* 492 U.S. 408, 415, 109 S. Ct. 2994, 106 L. Ed. 2d 343 (1989) (plurality opinion). The federal government holds approximately 80 percent of the reservation land in trust for the benefit of the Confederated Tribes and Bands of the Yakama Indian Nation (Nation); approximately 20 percent is owned in fee, either by the Nation or its individual members, nonmember Indians, and non-Indians, as a result of the allotment period of the late 19th century. *See Yakima County v. Confederated Tribes & Bands of Yakima Indian Nation,* 502 U.S. 251, 253-56, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992). The result is what the Nation calls a "crazy-quilt patchwork" of property ownership. Administrative Record (AR) at 127; *see* AR at 135.

In August 2002, the Yakama Tribal Council adopted a franchise ordinance whose preamble states in part:

> Utilities operating on the Reservation have placed Utility facilities on lands owned or controlled by the Yakama Nation without authorization or for which authorization has expired and the Tribal Council finds that it is in the public interest to require Utilities operating on the Reservation to obtain permission for such facilities by entering into agreements with the Yakama Nation.

AR at 9.

The ordinance requires any utility operating within the reservation to obtain a franchise from the Nation and provides for a fine of $1,000 per day for operating without a franchise. In addition, any utility operating within the reservation (regardless of whether it has obtained a fran-

chise) is required to pay a "franchise fee" of three percent of its gross operating revenue.[1] AR at 12.

PacifiCorp and Cascade, both of which are subject to the franchise fee, filed tariff revisions with the WUTC, seeking to pass on the costs to all customers within the reservation's boundaries.[2]

The WUTC's staff concluded the fee is "essentially a business and occupation tax, not a franchise fee." AR at 48. The staff recommended that the WUTC allow the tariff revisions by following its earlier decision in *Brannon v. Qwest Corp.*, WUTC Docket Nos. UT-010988, TG-010989, UE-010990, UE-010995, UT-010966, TG-011084 (Jan. 11, 2002), which addressed taxes imposed on utilities operating in the Lummi and Swinomish reservations.

Elaine Willman, a non-Indian who lives on fee land within the reservation in the community of Toppenish, opposed the tariff revision on behalf of herself and the Citizens Stand Up! Committee, of which she is executive director. She argued the utilities' decision to pay the franchise fee was imprudent because it was an invalid charge against nonmembers of the Nation who lived within the reservation. She also argued recovery of the fee would unlawfully discriminate against nonmembers of the Nation, who have no say in tribal government and do not benefit from it. Alternatively, she argued the franchise fee should be treated as a general operating expense and should not be charged solely to ratepayers within the reservation.

The WUTC accepted the staff's recommendations and took no action, allowing the tariff revisions to take effect by

---

[1] The ordinance defines gross operating revenue as "gross revenues from the sale and of Utility Service to customers on the Reservation after deducting therefrom (i) any business taxes on the sale or distribution of electricity on the Reservation paid to the United States, to the Yakama Nation, to the State of Washington, or to any municipality thereof, (ii) any revenue from sales at wholesale by one Utility to another when the Utility purchasing the service is not the ultimate customer, and (iii) any revenue from joint pole use." AR at 10.

[2] The WUTC's staff estimated PacifiCorp's payments to the Nation under the ordinance would be $500,000 per year; Cascade's payments would be approximately $120,000 per year.

operation of law. *See* RCW 80.28.060 (rate change takes effect in 30 days unless WUTC suspends it); WAC 480-07- -900(4)(b) ("no action required" portion of agenda). The WUTC's chairwoman summarized the reasoning:

> [Q]uestion number one is it a tax or a fee, I answer that question, this is a tax. Question number two, if it's a tax, is it a valid tax? And, I answer that question that it is not for me to decide. I would presume it's valid unless there is case law that clearly invalidates it and I don't think we have that case. If we get that case from federal court, there could be a different answer. But, I think we did go over that previous and previous decision of the [WUTC]. Question number three, if it is a tax, how must or should it be spread. So, that's really two parts, either how must it be spread if there is a must, or how should it be spread, if we have some discretion, and tentatively, I answer that question that it should be spread within the whole reservation. The fourth question is what about the affect [sic] of the tax and our application of it to the non tribal members? And, as I listen to this, clearly, the non tribal members are in a different position than the tribal members and they . . . the benefit of the tax on them may be different. But, it seems to me that . . . that is a question that is not one that we, either can or should act on, I am not sure of those two terms. Because, that gets right back to tribal law in general which is very complicated but, the relationship of the non tribal members to the tribe and to the taxes is . . . not our bailiwick and it seems to me it is the bailiwick of the federal court and I have some sympathy for the non tribal members here. It seems to me their answer that . . . the appropriate avenue is to challenge this tax in federal court and as I said earlier, if they succeed, we would follow the ruling of that court just as we have followed the ruling of the Department of Revenue in another situation.

AR at 209.

Petitioners initiated this action by filing a petition for review in the Yakima County Superior Court, naming as defendants the WUTC, Cascade, and PacifiCorp. The petitioners asked the court to enter a declaratory ruling holding that (1) the Nation has no authority to tax utility service to nonmember customers receiving service within the reser-

vation; (2) the utilities' decisions to pay the franchise fee was imprudent; and (3) the utilities' revised tariffs are unlawfully discriminatory. They also asked the court to enjoin the WUTC and the utilities from implementing the revised tariff and to order the WUTC to implement a mechanism for exempting nonmembers from paying the Nation's franchise fee. In support of these requests, the petitioners relied, in addition to the administrative record, on declarations of several individuals that were not part of the administrative record.

The utilities moved for dismissal, arguing (among other things) that the petitioners had failed to join the Nation as a party. By memorandum opinion, the superior court concluded it had no authority to determine the validity of the franchise fee and the Nation was not an indispensable party. The court also concluded that the WUTC properly considered only whether the franchise fee was "honestly debatable in law" and not "clearly unlawful," and thus that its decision was not arbitrary or capricious. Clerk's Papers at 745. The court denied all parties' motions.

After striking the petitioners' additional declarations, the superior court granted the defendants' motions for summary judgment and dismissed the petition. The petitioners have appealed the dismissal; the utilities have appealed the denial of their motion to dismiss for failure to join the Nation as a party.

■■ In seeking review, the petitioners contended the WUTC failed to perform a duty required by law. *See* RCW 34.05.570(4)(b). Under the Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, they are entitled to relief only if the agency's action or inaction is:

(i) Unconstitutional;

(ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;

(iii) Arbitrary or capricious; or

(iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.

RCW 34.05.570(4)(c). The petitioners contend the WUTC's failure to suspend the utilities' tariff revisions was arbitrary and capricious under subsection (iii). An agency's action is arbitrary and capricious only if it "is willful and unreasoning and taken without regard to the attending facts or circumstances." *Hillis v. Dep't of Ecology,* 131 Wn.2d 373, 383, 932 P.2d 139 (1997). "An appellate court reviewing agency action 'sits in the same position as the superior court, applying the standards of the WAPA directly to the record before the agency.' " *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n,* 149 Wn.2d 17, 24, 65 P.3d 319 (2003) (quoting *Tapper v. Employment Sec. Dep't,* 122 Wn.2d 397, 402, 858 P.2d 494 (1993)).

We first consider whether the court erred in striking the petitioners' additional declarations, which are not part of the administrative record. On review of an administrative agency's failure to perform a duty, a court "may hear evidence, pursuant to RCW 34.05.562, on material issues of fact raised by the petition and answer." RCW 34.05.570(4)(b). RCW 34.05.562 provides in pertinent part:

(1) The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues regarding:

(a) Improper constitution as a decision-making body or grounds for disqualification of those taking the agency action;

(b) Unlawfulness of procedure or of decision-making process; or

(c) Material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.

The petitioners apparently contend the additional declarations were admissible on review under subsection (c). They contend the new evidence is material to the WUTC's determination whether the franchise fee is valid. But this argument assumes the WUTC itself has the duty to make that determination. Because (as we conclude below) the WUTC lacks the authority to make that determination, the

additional declarations were not material to either the agency or the superior court proceedings, and the court did not err in striking them.

■ We next consider whether the WUTC arbitrarily and capriciously determined that the Nation's franchise fee was a prudently incurred operating expense, recoverable from the utilities' customers. Utilities in Washington are entitled to rates that are "just, fair, reasonable and sufficient." RCW 80.28.010(1). The WUTC is charged with determining whether rates are "unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of the provisions of the law, or that such rates or charges are insufficient to yield a reasonable compensation for the service rendered." RCW 80.28.020. These duties require the WUTC "to not only assure fair prices and service to customers, but also to assure that regulated utilities earn enough to remain in business." *People's Org. for Wash. Energy Res. v. Utils. & Transp. Comm'n*, 104 Wn.2d 798, 808, 711 P.2d 319 (1985). A utility is not permitted to recover every expense in its rate structure; the WUTC "has the power to review operating expenses incurred by a utility and to disallow those which were not prudently incurred." *Id.* at 810. The utility bears the burden of demonstrating a rate increase is "just and reasonable." RCW 80.04.130(4).

■■ The issue here is whether the Nation's fee is a prudently incurred expense for the utilities. It is undisputed that valid taxes charged to utilities may be passed on to the utilities' ratepayers. *See State ex rel. City of Seattle v. Dep't of Pub. Utils.*, 33 Wn.2d 896, 902, 207 P.2d 712 (1949); *see also King County Water Dist. No. 75 v. City of Seattle*, 89 Wn.2d 890, 897, 577 P.2d 567 (1978); *State ex rel. Pac. Tel. & Tel. Co. v. Dep't of Pub. Serv.*, 19 Wn.2d 200, 276, 142 P.2d 498 (1943). Pursuant to this rule, the WUTC permits a utility to recover taxes as expenses unless the taxes are "clearly invalid."

The petitioners contend the WUTC's presumption of a tax's validity should not apply when an Indian tribe imposes a tax on utility services provided to non-Indian

customers within a reservation. In *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659, 121 S. Ct. 1825, 149 L. Ed. 2d 889 (2001), the Supreme Court held: "The Navajo Nation's imposition of a tax upon nonmembers on non-Indian fee land within the reservation is . . . presumptively invalid."[3]

The petitioners' contention that the *Atkinson* presumption should apply to the WUTC's rate determination ignores the nature of these proceedings. *Atkinson* was an action for declaratory relief that directly challenged the validity of a tax imposed by the Navajo Nation. *Atkinson*, 532 U.S. at 649. Here, by contrast, the WUTC's responsibility is not to determine the validity of the Yakama Nation's franchise fee, but rather to determine whether the utilities' decision to pay the fee was prudent. The petitioners have provided no authority suggesting the WUTC has the jurisdiction to determine the validity of any tax.[4] Indeed, any such determination undoubtedly would have to be made in the absence of the Nation as a party,[5] which is immune from suit in state courts. *See Aungst v. Roberts Constr. Co.*, 95 Wn.2d 439, 443, 625 P.2d 167 (1981).

The petitioners argue in part that they are asking not for a determination of the fee's validity, but rather for application of the *Atkinson* presumption that the fee is invalid. In light of this presumption, the petitioners contend, the utilities' decision to pay the fee was imprudent, and they should not be permitted to recover the fees from their customers. This argument is unconvincing for two reasons.

---

[3] This presumption arises from the "general rule that Indian tribes lack civil authority over nonmembers on non-Indian fee land." *Atkinson*, 532 U.S. at 654. The presumption is subject to two important exceptions. *See Montana v. United States*, 450 U.S. 544, 565-66, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981).

[4] The petitioners rely on *Cordova v. Holwegner*, 93 Wn. App. 955, 971 P.2d 531 (1999), in which this court held a corporation licensed by the Yakama Nation is amenable to suit in a Washington court for personal injuries sustained by nonmembers. The court in *Cordova* did not consider the limits of the WUTC's authority, which is the issue here. Whether a Washington court in an original action would have authority to determine the validity of the franchise fee is *not* an issue here.

[5] The Nation presented its position to the WUTC and appeared as amicus curiae in the superior court. However, it has not appeared formally as a party at any stage of this case.

First, the determination whether the *Atkinson* presumption (or an exception) applies is a complex issue of federal law. The analysis amounts to a determination of the validity of the fee, a decision for which the WUTC admits it lacks the expertise and whose authority would be at least questionable. Second, the utilities' decision to pay the fee may have involved more than the question of the Nation's authority to impose it. The record suggests the Nation's franchise ordinance resolves disputes over the utilities' alleged trespasses on tribal land; the utilities thus legitimately may have chosen to pay the fee rather than to challenge its validity and (whatever the outcome) still face the Nation's trespassing allegations.

The petitioners also contend the WUTC's presumption of a tax's validity should not apply because Indian tribes are not "full territorial sovereigns [that] enjoy the 'power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens.' " *Atkinson*, 532 U.S. at 653-54 n.5 (quoting *Duro v. Reina*, 495 U.S. 676, 685, 110 S. Ct. 2053, 109 L. Ed. 2d 693 (1990)). This argument assumes the WUTC's presumption is based solely on the legitimate authority of the state and its political subdivisions to collect taxes. The presumption, however, is a logical and practical recognition that the validity of a tax is beyond the WUTC's competence and authority to decide.

The WUTC's presumption of validity does not modify the utilities' burden of demonstrating a tariff increase is just and reasonable under RCW 80.04.130(4). Rather, it merely establishes that a utility presumptively demonstrates that a rate increase to recover a tax is just and reasonable unless it is clearly invalid.

Finally, the petitioners contend the practical effect of the WUTC's presumption is that ratepayers will be denied an opportunity to challenge a tax. They argue utilities will *always* choose to increase rates rather than to incur the expense of challenging the validity of taxes. But under the WUTC's approach, rate increases based on tax costs are not *automatic*; the WUTC retains the authority to reject in-

creases based on clearly invalid taxes. The petitioners also argue the only way for individual ratepayers to litigate a potentially invalid tax is to challenge it directly in an alternative forum, in which they may lack standing or resources. Whatever the merits of this contention, the petitioners have not explained how the absence of another practical forum confers authority on the WUTC to determine the validity of a tax.

The WUTC does not act arbitrarily or capriciously by permitting utilities to recover taxes unless they are clearly invalid. Even under the WUTC's limited scrutiny, the petitioners' alternatively contend the franchise fee is clearly invalid. Indian tribes "retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Montana v. United States*, 450 U.S. 544, 565, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981). Among those retained powers is the power to tax:

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services. The power does not derive solely from the Indian tribe's power to exclude non-Indians from tribal lands. Instead, it derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction.

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982).

However, in *Montana*, the Supreme Court held that a tribe's powers "do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565 . The *Montana* Court identified two circumstances in which a tribe may regulate conduct of nonmembers on fee land: (1) when the nonmembers have entered into consensual commercial relationships with the tribe and (2) when the nonmembers'

conduct threatens or affects the "political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566. The Ninth Circuit Court of Appeals noted recently that although the *Montana* decision is more than 20 years old, the law governing the boundary between Indian sovereignty and non-Indians' activities "is still in its infancy." *Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribes,* 323 F.3d 767, 775 (9th Cir. 2003). It is beyond the scope of our decision here to determine the precise placement of that boundary; in the context of this appeal, the question (as with the WUTC) is whether the Nation's franchise fee is clearly invalid.

The parties initially dispute whether *Montana*'s general prohibition even applies in this case. The *Montana* rule applies only when a tribe attempts to regulate nonmember conduct on "non-Indian fee lands." *Montana,* 450 U.S. at 565; *see Atkinson,* 532 U.S. at 654. Although the Nation's franchise fee indirectly affects ratepayers within the reservation, it directly affects the utilities, whose gross revenues determine the amount to be paid. The relevant nonmembers here are the utilities. The issue, then, is whether the rights-of-way used by the utilities are the equivalent of non-Indian fee land.[6]

The petitioners rely on *Strate v. A-1 Contractors,* 520 U.S. 438, 454-56, 117 S. Ct. 1404, 137 L. Ed. 2d 661 (1997), in which the Court held a highway right-of-way within an Indian reservation may be the equivalent of non-Indian fee land. Although *Strate* involved a civil tort claim, the rule is "equally applicable to a tribe's legislative and regulatory authority." *Big Horn County Elec. Coop. v. Adams,* 219 F.3d 944, 950 (9th Cir. 2000). But to make this determination, a court must examine "(1) the legislation creating the right-of-way; (2) whether the right-of-way was acquired with the consent of the tribe; (3) whether the tribe had reserved the

---

[6] In enacting the franchise ordinance, the tribal council alleged utilities were unlawfully operating on lands owned or controlled by the Nation. If this allegation is true, the franchise fee is not directed at activities on non-Indian fee land, and *Montana* would not apply.

right to exercise dominion and control over the right-of-way; (4) whether the land was open to the public; and (5) whether the right-of-way was under state control." *Id.* (citing *Strate*, 520 U.S. at 454-56). The petitioners' argument focuses on the third criterion, but a complete analysis of the rights-of-way at issue here is not possible on the limited record before us. Under these circumstances, it is impossible to conclude the Nation's fee is clearly invalid under *Montana*.

Assuming for the sake of our analysis that *Montana* applies, the question is whether the circumstances satisfy either of its exceptions. The first exception permits tribal regulation of nonmembers' activities when the nonmembers have entered into consensual commercial relationships with the tribe. Whether provision of utility services on an Indian reservation constitutes such a consensual relationship is unclear. In *Big Horn*, 219 F.3d at 951 (citing *Strate,* 520 U.S. at 457), the Ninth Circuit court held a cooperative's provision of electrical service through facilities on federally granted rights-of-way created a consensual relationship justifying a tribe's tax. Without citing *Big Horn*, however, a federal district court in North Dakota held a telecommunications cooperative, which operated under a grant of state legislative authority, did not create a consensual relationship with a tribe by providing services within a reservation. *Reservation Tel. Coop. v. Henry*, 278 F. Supp. 2d 1015, 1023-24 (D.N.D. 2003); *see In re Application of Otter Tail Power Co.,* 451 N.W.2d 95, 104-05 (N.D. 1990). Also, while the Supreme Court has held there must be a nexus between the tax and the nonmembers' activities, *see Atkinson*, 532 U.S. at 656, the required connection is not easy to describe. For example, in *Big Horn* the court invalidated an ad valorem tax on the value of nonmembers' property but noted the tribe "is free to adopt a different tax scheme that complies with *Montana." Big Horn*, 219 F.3d at 951. Here, the utilities' facilities throughout the reservation arguably establish both the consensual relationship with the tribe and the required nexus between the utilities' activities and the franchise fee.

The petitioners rely primarily on *Atkinson*, which addressed the validity of a tax imposed by the Navajo Nation on nonmember guests of a hotel that was located on fee land and could be accessed via non-Indian public rights-of-way. *Atkinson*, 532 U.S. at 647-49. The Supreme Court held the tax was invalid in part because it did not satisfy the first *Montana* exception. *Id.* at 655-57. The Court held there was not a sufficient consensual relationship between the tribe and the hotel guests' activities: "The hotel occupancy tax at issue here is grounded in [the hotel owner's] relationship with its nonmember hotel guests, who can reach the Cameron Trading Post on . . . non-Indian public rights-of-way." *Id.* at 656-57. The Court's decision made it unnecessary to address whether a tax on the hotel directly, rather than on its guests, would be proper. *Id.* at 654 n.6. The Yakama Nation's franchise fee differs from the tax in *Atkinson* in at least two ways: (1) it is a charge directed at the utilities themselves, not the ratepayers (the equivalent of the hotel guests in *Atkinson*) and (2) the utilities' activities on the reservation are not limited to non-Indian fee land and public rights-of-way. Whether either of these facts is sufficient to validate the franchise fee is not clear.

*Montana*'s second exception permits tribal regulation when nonmembers' conduct threatens or affects the "political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. This exception "is only triggered by *nonmember conduct* that threatens the Indian tribe; it does not broadly permit the exercise of civil authority wherever it might be considered 'necessary' to self-government." *Atkinson*, 532 U.S. at 657 n.12. This determination is a fact-intensive inquiry that is not subject to summary determination. *Burlington N. Santa Fe R.R.*, 323 F.3d at 774-75. The superior court determined that the utilities' alleged encroachments on tribal property threatened the political integrity, security, or health and welfare of the Nation. Whether this is true, as the superior court noted, cannot be determined on the limited record before us. Although the utilities deny the encroachments and the

petitioners contend they do not threaten the Nation's political integrity, any analysis obviously would require the participation of the Nation itself, which cannot be compelled.

At best, the petitioners have established the validity of the Nation's franchise fee is questionable. However, on the limited record before the WUTC and us, it is not possible to conclude the fee is clearly invalid. The WUTC's decision to allow the revised tariffs to take effect was not willful and unreasoning, and therefore was not arbitrary and capricious. The superior court's decision to that effect is affirmed.

We next consider whether the WUTC arbitrarily or capriciously determined the franchise fee did not discriminate against nonmember ratepayers and should be treated as a tax, to be recovered only from ratepayers in the affected area.[7] RCW 80.28.090 provides:

> No gas company, electrical company or water company shall make or grant any undue or unreasonable preference or advantage to any person, corporation, or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Whether a rate is unduly or unreasonably preferential is a determination within the WUTC's discretion. *ARCO Prods. Co. v. Wash. Utils. & Transp. Comm'n,* 125 Wn.2d 805, 816, 888 P.2d 728 (1995).

The petitioners contend first that the revised tariffs grant an undue or unreasonable preference to members of the Nation because nonmembers receive no benefits from and do not have a voice in the tribal government. They misperceive the purpose of RCW 80.28.090, which is to assure that customers who receive the same service pay the same rates. *ARCO Prods. Co.* 125 Wn.2d at 816-17. Under the revised tariffs here, all of the utilities' customers within

---

[7] To the extent the petitioners contend the Nation's franchise fee is discriminatory because it is invalid, our analysis above already has addressed that issue.

the boundaries of the reservation will receive the same service at the same rates. The tariffs thus do not violate RCW 80.28.090.[8]

The petitioners also contend the WUTC discriminated against nonmembers by characterizing the franchise fee as a tax, which must be recovered solely from customers within the reservation. Whether a charge is a tax or a franchise fee will determine how the charge will be recovered by the utility. If the charge is characterized as a tax, the utility may recover it by passing it on directly to ratepayers within the taxing authority; but if the charge is a franchise fee, it is considered part of the utility's general operating expenses, which are recovered from customers throughout its system. *See State ex rel. Pac. Tel. & Tel. Co. v. Dep't of Pub. Serv.*, 19 Wn.2d 200, 277-81, 142 P.2d 498 (1943).

> [P]ayments made . . . under franchises such as those here in question, as matter of law fall within the classification of general operating expenses . . . .
>
> Such payments differ basically from taxes paid pursuant to excise or similar taxes levied by a municipality. Payments made under franchises such as those here in question are based upon contracts which grant to [the utility], *inter alia*, the right to install portions of its equipment in the public streets. The installation of [the utility's] plants pursuant to the franchise contracts benefits not only the residents of the cities, but is a benefit to rate payers living without the city limits. In entering into these contracts, [the utility] was enlarging its service and making the same more generally useful and convenient.

---

[8] The petitioners rely on *King County Water District No. 75 v. City of Seattle*, 89 Wn.2d 890, 903, 577 P.2d 567 (1978), in which the Supreme Court held a tax may be recovered only from its beneficiaries. The court has distinguished *King County* on the basis that the utility in that case was located entirely outside the taxing authority's city limits. *Burba v. City of Vancouver*, 113 Wn.2d 800, 804, 783 P.2d 1056 (1989). In *Burba*, the utility operated a single, integrated system with facilities inside and outside the taxing authority's city limits. *Id.* at 801. Here, the utilities' systems are similarly integrated throughout the reservation, serving both Indian and non-Indian customers. Moreover, even if receipt of a benefit from a tax were a factor to be considered under these circumstances, it is not true that nonmembers receive no benefit from the franchise fee. They receive continued utility services, which might be disrupted or unavailable if the utilities were required to relocate or remove their facilities.

While the distinction between payments made by [the utility] pursuant to franchises which it enjoys, and payments made pursuant to municipal taxing ordinances may seem rather finely drawn, we are convinced that a distinction in fact exists, and that, as to the former class, the law requires that such payments be considered as general operating expenses, and that (subject to the exception . . . as to an excessive or unreasonable exaction) the department lacks legal authority to direct or permit [the utility] to pass such payments along to the rate payers within the respective cities within which [the utility] is operating pursuant to the franchises.

*Id*. at 281.

The parties' characterization of a charge as either a tax or a franchise fee is not determinative. *See Samis Land Co. v. City of Soap Lake*, 143 Wn.2d 798, 805-06, 23 P.3d 477 (2001). In this context,[9] "a tax is an enforced contribution of money, assessed or charged by authority of sovereign government for the benefit of the state or the legal taxing authorities. It is not a debt or contract in the ordinary sense, but it is an exaction in the strictest sense of the word." *State ex rel. City of Seattle v. Dep't of Pub. Utils.*, 33 Wn.2d 896, 902, 207 P.2d 712 (1949). A franchise, by contrast, "is a contract between a municipal corporation and a person who has applied for leave to engage in certain business operations of a public nature within the limits of the municipality." *Pac. Tel. & Tel.*, 19 Wn.2d at 278.

The Nation's ordinance contains elements of both taxes and franchise fees. It requires all utilities operating within the reservation to obtain franchises, presumably as a charge for placing the utilities' facilities on land owned or controlled by the Nation. These fees appear to be franchise fees. But the ordinance also exacts an additional portion of the utilities' gross operating revenues, regardless of

---

[9] The WUTC and Cascade rely on a three-part test to determine whether a charge is a permitted regulatory fee or an unlawful property tax under Washington Constitution article VII, section 1. *See Covell v. City of Seattle*, 127 Wn.2d 874, 879, 905 P.2d 324 (1995). It is not clear whether this test would apply to the WUTC's determination here. If it does, it supports the WUTC's decision.

whether the utility has obtained a franchise. This charge is a unilateral exaction, not subject to contractual negotiation; the utilities receive nothing in return. The WUTC's conclusion that this portion of the ordinance exacts a tax is not arbitrary and capricious.

Our resolution of the petitioners' issues makes it unnecessary to address the utilities' contention that the Yakama Nation was an indispensable party, whose absence from the proceedings requires dismissal under CR 19(b).

We deny the petitioners' request for an award of reasonable attorney fees and expenses pursuant to RCW 4.84-.350(1) because they are not the prevailing parties.

The superior court's order is affirmed. Reasonable attorney fees and costs are denied.

SWEENEY and KURTZ, JJ., concur.

Review granted at 153 Wn.2d 1031 (2005).